GEORGE R. RICHIE AND BARBARA T. RICHIE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richie v. Commissioner
Docket No. 2677-92
United States Tax Court
T.C. Memo 1995-59; 1995 Tax Ct. Memo LEXIS 60; 69 T.C.M. (CCH) 1836; February 2, 1995, Filed *60 Decision will be entered under Rule 155. For petitioners: Donald L. Stuart and Steven R. Hake. For respondent: Joni D. Larson and Gerald L. Brantley. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in petitioners' joint Federal income tax and additions to tax and increased interest as follows: Additions to Tax Sec. 6653(a)/
Sec. 6653(a)(1)/
6653(a)(2)/
Sec.
Sec.
Sec. Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6659
6661
6621(c)
1978
$  81,854
$  4,093
--
$ 24,556
$   --   **
1979
77,676
3,884
--
23,303
--   **
1980
96,746
4,837
--
29,024
--   **
1981
229,460
11,473 *
68,838
--   **
1982
232,244
11,612 *
69,629
--   **
1983
248,205
12,410 *
74,437
--   **
1984
138,883
6,944 *
41,665
--   **
1985
95,919
4,796 *
28,542
--   **
1986
106,519
5,326 *
--  26,629 **
1988
22,989
1,149
--
--
--  --
* 50 percent of the interest due on the portion of the
underpayment attributable to negligence.
** 120 percent of the interest accruing after Dec. 31, 1984,
on the portion of the underpayment attributable to a
tax-motivated transaction.
*61 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After settlement of some issues, the issues remaining for decision are: (1) Whether petitioner George R. Richie's investment in a number of master videotapes was made with an actual and honest profit objective; (2) whether purported promissory notes associated with petitioner's investment in the master videotapes had economic substance and constituted genuine indebtedness that is to be recognized for Federal income tax purposes; (3) the extent, if any, to which petitioners are entitled to investment tax credits and depreciation and loss deductions with regard to the master videotapes; and (4) whether petitioners are liable for the various additions to tax and increased interest determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioners resided in Dallas, Texas. All references to petitioner in the singular are to petitioner George R. Richie. Production and Tax Shelter Promotion of the Master *62 Videotapes
On September 18, 1981, James Hudson (Hudson) formed Montage Productions, Inc. (Montage), as a wholly owned Texas corporation to produce and to sell to investors master videotapes of country and rock music. Through Montage, Hudson promoted a master videotape tax shelter program known as "The Montage Video Package". Under this program, Hudson and Montage obtained from unrelated parties video film footage of three different country and rock music concerts that were held in Texas in 1981. The first concert was called Joe Ely's 2nd Annual Tornado Jam and was held on May 31, 1981, in Lubbock, Texas (the Lubbock Concert). At this concert, a number of country and rock singers and bands performed. The second concert consisted of a performance by Joe Ely and was held on July 10, 1981, in Gruene, Texas (the Gruene Concert). The third concert was called Joe Ely's South Texas Tornado Jam and was held on July 11, 1981, in Austin, Texas (the Austin Concert). At this concert, a number of country and rock singers and bands performed. With regard to the Lubbock Concert, Steve Moss of Steve Moss Productions, Inc. (Moss Productions), filmed the performances and also produced the *63 videotape at a total production cost of approximately $ 35,000. Sometime in 1981, Montage purchased the Lubbock Concert videotape from Moss Productions for $ 35,000. With regard to the Gruene and Austin Concerts, the record in this case does not indicate who filmed the concerts, who produced the videotapes of the concerts, what the production costs were for the film and videotapes of the concerts, or what Montage paid to acquire the videotapes of these concerts. From the above three videotapes of the three concerts, Montage cut and produced 26 separate master videotapes each of which consisted of approximately 30 minutes of music from one of the three concerts. These 26 master videotapes, with a duration of approximately 30 minutes each, constituted the master videotapes that are the subject of the tax shelter investment program at issue in this case, and they are referred to generally hereinafter as the "Tornado Jam MVT's" or simply as the "MVT's". In addition to whatever costs Montage incurred in acquiring the original three videotapes of the three complete concerts, Montage's total cost to produce all 26 of the 30-minute Tornado Jam MVT's was approximately $ 20,000. The production *64 quality of the Tornado Jam MVT's is generally poor. The camera angles, lighting, and overall presentation are substandard. The audio quality is poor, and, since microphones were not placed in the audience, the audience reaction to the live performances is not generally audible. As an example, one of the MVT's of a Joe Ely performance was filmed in front of an audience in a small indoor area, with low ceilings, a tiny stage, poor lighting, and poor sound. Some of the performances were filmed at what appear to be dress rehearsals without an audience. In general, the quality of the MVT's is amateurish and resembles home movies. Tax benefits were a primary focus of the promotion and sale of the Tornado Jam MVT's to individual investors at a price of $ 160,000 for each 30-minute MVT. Highlighted in the promotional materials were various calculations of the potential tax benefits (namely, the investment tax credits and depreciation deductions) that allegedly would be available with respect to investments in the MVT's. Nowhere in the promotional materials is there a projection or a discussion of the potential after-tax revenue or profit to be made from investing in, distributing, *65 or exploiting a Tornado Jam MVT. In the promotional materials, it was represented that petitioner would receive two appraisals from qualified independent experts supporting the $ 160,000 purchase price for each of the MVT's. On September 1, 1981, Montage entered into an agreement with James A. Rumpf & Associates, Inc. (JRA), a Texas corporation, for JRA to sell the Tornado Jam MVT's to investors. Under this agreement, JRA was to receive 25 percent of the initial cash downpayment received from each investor for the purchase of a Tornado Jam MVT. Petitioner's Investment in and Purchase of 18 of the MVT's
In 1955, petitioner graduated from the University of Texas with a degree in architecture. Petitioner became a successful architect with a major architectural firm in Dallas, Texas. Petitioner was the lead architect in the construction of the Reunion Arena in Dallas, Texas. Petitioner retired in 1991. Before making his investment in the Tornado Jam MVT's, petitioner had no particular experience in producing, investing in, purchasing, and distributing videotapes. Petitioner did view some of the MVT's, and petitioner obtained literature relating to some of the musicians *66 who were featured on the MVT's, and petitioner collected several newspaper and magazine articles that addressed the potential future growth of cable television and the home video market. Before making his investment in the MVT's, petitioner was not provided, and petitioner did not obtain the appraisals or valuations of the MVT's that were promised in the promotional material. Petitioner did not conduct an independent investigation into the profitability or fair market value of the MVT's, nor did petitioner conduct an independent investigation into the potential markets that were available for distribution of the MVT's. As indicated, the promotional material obtained by petitioner did not contain any revenue or profit projections relating to ownership of the MVT's, and petitioner was not given any such projections before he purchased the MVT's. The only revenue or profit projections that petitioner considered with regard to the MVT's were incomplete calculations that were made by petitioner himself. On October 12, 1981, before making his investment in the MVT's, petitioner consulted with the same law firm that issued the tax opinion letter to the promoter of the tax shelter concerning *67 an investment in the Tornado Jam MVT's. On October 20, 1981, petitioner entered into 18 separate agreements with Montage for the purchase of 18 of the MVT's for the stated purchase price of $ 160,000 each. On four of the MVT's that petitioner purchased, there were recorded performances by Joe Ely. On one tape there was recorded a performance by Stevie Ray Vaughan. On the other 13 tapes that petitioner purchased there were recorded performances by the following musicians and bands: Jay Boy Adams (1 tape), Terry Allen (2 tapes), Marcia Ball (1 tape), Gary Nunn (1 tape), Ray Wiley (2 tapes), The Maines Brothers (1 tape), The Fabulous Thunderbirds (1 tape), The Cold Chisel (2 tapes), and The Planets (2 tapes). Under the terms of the purchase agreement for each MVT, the $ 160,000 stated purchase price was to be paid by petitioner by making a $ 12,500 cash downpayment and by executing a $ 147,500 purported recourse promissory note bearing interest at 12 percent per year. The total $ 225,000 in cash downpayments that was due from petitioner with respect to all 18 separate purchase agreements [1] was paid by petitioner in October and November of 1981. *68 On October 20, 1981, petitioner executed in favor of Montage 18 separate promissory notes each in the amount of $ 147,500 reflecting petitioner's stated deferred indebtedness under each purchase agreement. During the first 10 years of the promissory notes, unless petitioner realized profits from distribution or exploitation of the MVT's, petitioner had no obligation to make any payments of principal or interest on the promissory notes. If, during the first 10 years of the promissory notes, petitioner did realize profits from distribution or exploitation of the MVT's, payments of principal and interest on the promissory notes were to be made by petitioner to the extent of 50 percent of the net profits realized. At the end of 10 years, the balance due on the promissory notes plus accrued interest were stated to be due. Additionally, even after all of the principal and interest payments were made under the terms of the promissory notes, petitioner was required to pay Montage 20 percent of all subsequent gross sales proceeds received from distribution of the MVT's. Petitioner executed the 18 promissory notes in the amount of $ 147,500 each, reflecting a total stated principal indebtedness *69 under all 18 of the promissory notes of $ 2,655,000. [2]
Petitioner did not negotiate with Montage for a reduction or differential in the purchase price of each MVT based on the poor quality of the MVT's, on the relative reputation of the different performers on the MVT's, nor on any other basis. The record does not indicate that any negotiations took place concerning either the stated purchase price of the MVT's or the terms of the purchase agreements. Under the purchase agreements, petitioner was to have the right to distribute, license, and otherwise commercially exploit the MVT's. The promotional material implies that the MVT's could be licensed to television stations and cable television companies for broadcast to the public and rented to the public at retail for use in home video machines. Under the terms of the purchase agreements, Montage retained an exclusive and perpetual license to utilize for its own purposes any 2 1/2-minute segment of each MVT. Montage *70 also retained an exclusive worldwide license to all supplemental merchandise exploitation of the MVT's. Under the purchase agreements, Montage was obligated to obtain permits or releases from the musicians performing on the MVT's to authorize petitioner to attempt to commercially exploit the MVT's. The purchase agreements acknowledge that petitioner might have to pay to the musicians royalties in exchange for these releases. The amount of the royalties is not specified, but the purchase agreement indicates that the royalties would not exceed 50 percent of petitioner's net receipts from the MVT's. Although Montage never provided petitioner with releases from any of the musicians that performed on the MVT's, Hudson did obtain from Joe Ely a blanket release purportedly authorizing Basement Productions, Inc., one of Hudson's controlled corporations, to commercially exploit the videotapes of the concerts. This release does not establish that Joe Ely had authority to give releases on behalf of the other musicians performing at the three concerts and, in any event, by its terms it is effective for only 18 months with respect to exploitation of the MVT's through sales to television stations *71 and cable television companies. The purchase agreements required Montage to sell to petitioner only Tornado Jam MVT's that were of professional quality, suitable for exhibition on commercial television stations, and from which first quality exhibition videotapes could be reproduced. On November 19, 1981, after petitioner had purchased the MVT's from Montage, petitioner consulted with an independent accountant regarding his investment in the MVT's. Sometime prior to December 31, 1981, petitioner apparently received all 18 MVT's that he had purchased. Petitioner never insured the MVT's, and petitioner stored the MVT's in his lawyer's office, not in a location with a climate-controlled environment, which is standard industry practice for storage of valuable film and video assets. As of the time of trial, the MVT's had not generated any revenue, petitioner had not received any income from his ownership of the MVT's, and petitioner had not made any payments of principal or interest on any of the promissory notes. Marketing and Distribution of the MVT's
From the time petitioner purchased the MVT's in October of 1981 until June of 1982, the trial evidence does not indicate that *72 there was any distribution agreement in effect with respect to the MVT's. On June 1, 1982, petitioner entered into a distribution agreement with Tri-Coastal Video, Inc. (Tri-Coastal), which agreement was signed by Michael Brovsky, president of Tri-Coastal. Under this distribution agreement, petitioner gave Tri-Coastal an exclusive worldwide license to distribute, market, and otherwise exploit all 18 of the MVT's that petitioner had purchased. The license was to last for a period of 1 year and was to be renewed automatically each year unless terminated by either party. As compensation for its distribution services, Tri-Coastal was to receive 40 percent of any gross receipts received from distribution of petitioner's MVT's. Tri-Coastal, however, never implemented any distribution program. The most that Tri-Coastal did was to suggest some general "ideas" for marketing of the MVT's. On one occasion, on December 31, 1981, Hudson, who was the promoter of the Tornado Jam MVT's and who had no distribution agreement with petitioner, delivered copies of all 18 of petitioner's MVT's to Texas Prime Time Video, Inc. (Prime Time), a retail video equipment and videotape rental store. Neither *73 Hudson nor petitioner had an agreement with Prime Time regarding the income that petitioner would receive if any copies of the MVT's were rented to the public. Prime Time made copies of the MVT's available for rent to the public along with the other videotapes that it was offering for rent. Prime Time used copies of the MVT's and of other videotapes to demonstrate to potential customers how video equipment was operated. On December 17, 1982, petitioner mailed to Hudson a letter in which petitioner complained about the poor production quality of the MVT's and about the inadequate marketing effort of the MVT's, as follows: I would like to express my profound concern over the lack of final edit of the tapes, the negligible marketing effort, your representations and promises, and the program in general. I want you to know that I do not feel satisfied with the nature of the tapes and my investment therein due to the length of time involved between my purchase of same and the fact that they are still not final edited. I expect, as a minimum, that the tapes will be final edited in a Class "A" condition as was your obligation under the purchase documents. * * * Although in both *74 conversations I had intended to speak with Michael Brovsky, you answered the phone which indicates that you and Michael are at least officing together and should be coordinating the marketing of my tapes. I again wish to reiterate to both of you how uncomfortable I am with the tapes, your lack of marketing effort, and the program in general. * * *
In December of 1982, apparently as a result of petitioner's complaints, Hudson offered to petitioner 2 cashier's checks in the total amount of $ 212,500 as a complete refund of the cash downpayments that petitioner had made with regard to 17 of the 18 MVT's. Petitioner, however, even though he was dissatisfied with the quality of the MVT's, endorsed the cashier's checks and returned them to Hudson. There is no evidence in the record to indicate that after petitioner mailed the above letter to Hudson the editing of the MVT's was completed, or that the MVT's were otherwise improved to make them suitable for television broadcast. On April 22, 1988, petitioner entered into a distribution agreement with Happy Hour Video, Inc. (Happy Hour), apparently a Texas corporation, which agreement was signed by Gloria Moore, president of Happy *75 Hour. Under the terms of the agreement, Happy Hour was granted an exclusive worldwide license to distribute, market, and otherwise exploit all 18 MVT's, and Happy Hour was to receive a fee of 35 percent of gross receipts from sales made in the United States and Canada and 40 percent of gross receipts from sales made in other countries. The distribution agreement was for 1 year, but was renewable at Happy Hour's option for 5 additional years. Hudson, promoter of the Tornado Jam MVT tax shelter and president of Montage, became the sole owner and president of Happy Hour in 1989 or 1990. On May 1, 1989, petitioner entered into a distribution agreement with Pegadillo Productions, Inc. (Pegadillo), also apparently a Texas corporation, which agreement was signed by Gloria Moore, president of Pegadillo. Under the terms of this agreement, Pegadillo was granted an exclusive worldwide license to distribute or otherwise exploit all 18 MVT's, and Pegadillo was to receive a fee of 35 percent of gross receipts from sales made in the United States and 45 percent of gross receipts from sales made in other countries. The original term of this agreement was to last until May 1, 1991. On May 1, *76 1991, the distribution agreement with Pegadillo was extended to May 1, 1993. The trial evidence in this case does not explain the overlapping nature of the above distribution agreements. All of the distribution companies were in some way associated with Hudson or Montage. None of the companies that agreed to distribute and market the MVT's ever implemented any type of marketing or distribution plan for the MVT's. No sales of any of the MVT's or videotape copies of the MVT's were ever made. During 1981 through 1988, petitioner made various written and oral inquiries to Hudson and representatives of the various distribution companies relating to petitioner's investment in the MVT's and his concern about the inadequate marketing effort. Some of these written and oral communications involved topics relating to the marketing effort and specific "ideas" that petitioner, Hudson, or the representatives of the distribution companies had for marketing the MVT's, such as syndication, mail order sales through Turner Broadcasting, producing a sales brochure, and obtaining a sponsorship of the MVT's by Apple Computer. None of these ideas was ever implemented. In 1984 and 1985, petitioner *77 loaned to Hudson a total of $ 85,000, apparently either to assist Hudson to pay legal fees or to provide funds to promote Joe Ely. During 1988 and 1989, apparently to assist with distribution efforts with regard to the MVT's, petitioner made cash contributions to Pegadillo and Happy Hour of $ 30,000 and $ 2,500, respectively. None of the copies of the MVT's was ever rented to the public. As of the time of trial, petitioner had not received any income from his ownership of the MVT's, and petitioner had not made any payments of principal or interest on any of the promissory notes. Loss, Replacement, and Sale of Promissory Notes
Sometime before March 29, 1990, Montage lost 17 of the 18 promissory notes that had been executed by petitioner in 1981 in connection with petitioner's investment in the MVT's. These 17 lost promissory notes reflected a total stated principal indebtedness of $ 2,507,500 (17 x $ 147,500). On March 29, 1990, petitioner, without any apparent consideration, executed an "Estoppel Certificate" in which petitioner represented that he had executed 17 replacement promissory notes that were identical in all respects to the 17 promissory notes that had been *78 lost by Hudson or Montage. Petitioner executed the 17 replacement notes in connection with a plan for Hudson, Montage, and/or Happy Hour to sell all 18 of petitioner's promissory notes to a corporation by the name of 84 HCT, Inc. (HCT), a Texas corporation. HCT was a closely held corporation, the ownership of which is not clearly established in the record, but HCT apparently is owned by the Hicks 1984 Children's Trusts (Hicks Trusts) or by R. Steven Hicks (Hicks), trustee of the Hicks Trusts. In the Estoppel Certificate, petitioner's reason for executing these replacement notes was stated as follows: It is understood and agreed to by me that the Replacement Notes are being executed by me and the confirmations are given by me herein to induce you to enter into an exchange agreement * * * among you [HCT], Montage Productions, Inc., Jim Hudson * * * and certain other parties, whereunder the Replacement Notes * * * are to be transferred to you [HCT].* * *.
On March 30, 1990, the 17 replacement promissory notes and the one original promissory note that petitioner had executed in the total principal amount of $ 2,655,000 were transferred by Montage (holder of 14 of the promissory *79 notes) and by Happy Hour (holder of 4 of the promissory notes) to HCT in exchange for $ 400,000 in promissory notes executed by H & M Entertainment, Inc. (H & M), and made payable to the Hicks Trusts and assigned by the Hicks Trusts to HCT, $ 270,000 in cash, and 1600 shares of stock in H & M, which represented a controlling interest in H & M. Before the above exchange, Hicks, and Gloria Moore, Hudson's wife, owned 100 percent of the outstanding stock of H & M. After the 18 promissory notes were transferred to HCT, Hudson and his wife owned 100 percent of the outstanding stock of H & M. On December 18, 1991, HCT brought an action against petitioner in the District Court of Dallas County, Texas, 160th Judicial District (Texas District Court) seeking to enforce the 18 promissory notes of petitioner that were then held by HCT. In its complaint, HCT claimed that on October 20, 1991, the 18 promissory notes matured according to their terms and that petitioner had failed to make any payments thereon. In the above action, petitioner did not raise any of the obvious defenses that could have been raised against enforcement of the promissory notes, and on June 2, 1992, the Texas District *80 Court, without an adversarial hearing, entered a stipulated judgment against petitioner in the principal amount of $ 2,655,000 plus accrued interest. Apparently as a result of the above judgment, on November 18, 1992, petitioner filed in the U.S. Bankruptcy Court for the Northern District of Texas (bankruptcy court), a voluntary Chapter 11 bankruptcy petition. Petitioner, in his disclosure statement to the bankruptcy court, named HCT as an unsecured nonpriority creditor. On January 12, 1993, the bankruptcy court lifted the automatic stay to permit this case to proceed in the Tax Court. Petitioner's bankruptcy action is awaiting, the outcome of the instant Tax Court action. Under an apparent agreement between petitioner and HCT and reflected in the proposed plan of reorganization filed by petitioner with the bankruptcy court, if petitioner prevails in this Tax Court case, his bankruptcy assets will be used to pay off petitioner's promissory notes now held by HCT. Petitioners' Tax Returns and IRS Audit
With regard to the investment tax credit and depreciation deductions that were to be claimed in connection with petitioner's investment in the MVT's, Hudson compiled and *81 gave to petitioner summaries of the production costs that allegedly were incurred in the United States relating to each of the MVT's. Except for the title of the particular MVT that appeared at the top of each production cost summary given to petitioner by Hudson, all 18 production cost summaries were identical in every respect. The total qualified U.S. production costs for each of the MVT's was calculated by Hudson and reflected on each production cost summary to be exactly $ 164,469.01. Hudson did not provide to petitioner any documentation to support these alleged production costs, and no documentation in support thereof was offered into evidence. Petitioner received from JRA a letter dated March 18, 1982, indicating that petitioners could compute their investment tax credits and depreciation deductions based on a total investment per MVT of $ 160,000, as follows: Your total Qualified U.S. Production Costs exceeded One Hundred Sixty Thousand Dollars ($ 160,000.00) per MVT. Please note that your depreciation and Investment Tax Credit can only be based on $ 160,000.00 because that is the total extent that you are at risk for.
On their 1978 through 1988 joint Federal income *82 tax returns, petitioners claimed substantial losses and investment tax credits relating to petitioner's investment in the MVT's. The losses claimed by petitioners in 1981 through 1985 were largely attributable to depreciation deductions claimed in the total amount of $ 2,880,000 that related to petitioner's investment in the MVT's. The losses were reported by petitioners as Schedule C business losses and resulted in claimed net operating loss carryovers that were used by petitioners to reduce their reported 1983 through 1988 Federal income taxes. Also with regard to petitioner's investment in the MVT's, petitioners for 1981 claimed investment tax credits of $ 288,000, which resulted in petitioners claiming a credit against their 1981 Federal income taxes and investment tax credit carrybacks that were used by petitioners to reduce by that total amount their 1978 through 1981 Federal income taxes. On June 1, 1983, respondent began the audit of petitioners' joint Federal income tax returns at issue in this case. Respondent disallowed petitioners' claimed losses and investment tax credits relating to petitioner's investment in the MVT's on the grounds, among others, that petitioner *83 did not have an actual and honest profit objective, that the $ 147,500 promissory notes were not genuine, that the MVT's had little or no value, that the promissory notes and the MVT's did not support the large investment tax credits and depreciation deductions claimed, and that the MVT's were not placed in service in 1981. Respondent also determined the various additions to tax and increased interest. OPINION Profit Motive, Economic Substance, and Genuineness of Promissory Notes
Generally, in order to be allowable, depreciation deductions and investment tax credits must be supported by the taxpayer's actual and honest profit objective. Levy v. Commissioner, 91 T.C. 838, 871 (1988); Ronnen v. Commissioner, 90 T.C. 74, 91 (1988). Absent an actual and honest profit objective, tax deductions relating to an investment are limited under section 183 to the income generated from the activity. Dreicer v. Commissioner, 78 T.C. 642, 644-646 (1982), affd without opinion 702 F.2d 1205 (D.C. Cir. 1983). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive *84 list of factors to be considered in determining the existence of the requisite profit objective. No one factor, however, is determinative. The resolution of whether a profit objective exists is to be made on the basis of all of the facts and circumstances. Hulter v. Commissioner, 91 T.C. 371, 393-394 (1988); Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs. More weight is to be given to objective factors than to self-serving statements of intention. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Siegel v. Commissioner, 78 T.C. 659, 699 (1982). Taxpayers' expectations of profit need not be reasonable. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b), Income Tax Regs.
The economic substance of the transactions is one of the factors that is relevant in analyzing a taxpayer's actual and honest profit objective. Cherin v. Commissioner, 89 T.C. 986 (1987). Transactions that are entered into solely for purposes of obtaining tax benefits and that are without *85 economic substance will be considered shams for Federal income tax purposes, and purported indebtedness associated therewith will not be recognized. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361 (1960); Sochin v. Commissioner, 843 F.2d 351, 353 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23; Hudson v. Commissioner, 103 T.C. 90, 100 (1994); Helba v. Commissioner, 87 T.C. 983, 1004 (1986), affd without published opinion 860 F.2d 1075 (3d Cir. 1988). We have defined a sham transaction as a transaction that is lacking in economic reality and that has no economic significance beyond expected tax benefits. Hudson v. Commissioner, supra at 100; Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). *86 In deciding whether transactions lack economic substance, we consider such factors as the lack of arm's-length negotiations, inflated stated purchase prices, the structure of the financing of the transactions, and the degree of adherence to contractual terms. Rose v. Commissioner, 88 T.C. 386, 410-411 (1987), affd 868 F.2d 851 (6th Cir. 1989); Helba v. Commissioner, supra at 1004. As the Supreme Court explained, to be recognized for Federal income tax purposes, transactions must have economic substance that is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". Frank Lyon Co. v. United States, supra at 583-584. The financing of transactions with deferred indebtedness that is very unlikely to be paid is a strong indication of the lack of economic substance. See, e.g., Frank Lyon Co. v. United States, supra at 582 n.17; Durkin v. Commissioner, 87 T.C. 1329, 1376 (1986), *87 affd 872 F.2d 1271 (7th Cir. 1989); Burns v. Commissioner, 78 T.C. 185, 212 (1982). The fair market value of property is particularly relevant in deciding whether large indebtedness associated with an investment in property is to be recognized as genuine indebtedness. See, e.g., Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976). Cost is generally good evidence of fair market value. Soriano v. Commissioner, 90 T.C. 44, 58 (1988). With regard to petitioner's investment in the MVT's, respondent argues that the evidence in this case with regard to most, if not all, of the factors set forth in section 1.183-2(b), Income Tax Regs., supports respondent's determination that petitioner did not have an actual and honest profit objective for his investment in the MVT's and that petitioner's 18 promissory notes did not constitute genuine indebtedness. Petitioners argue that petitioner had an actual and honest profit objective with regard to his investment in the MVT's and that the promissory notes constituted genuine indebtedness. Petitioners argue generally *88 that the investment in the MVT's anticipated the boom in the retail home video market that occurred in the mid-1980s. Petitioners note, among other things, that petitioner investigated the background of the various musicians that performed on the MVT's, that some of the musicians were successful, that petitioner investigated the video industry, that petitioner entered into agreements with various distribution companies to market the MVT's, and that the $ 147,500 promissory notes were on their face recourse promissory notes. Petitioners also argue that respondent's audit was so intrusive that it made it impossible to successfully market and distribute the MVT's. Petitioners note further that when 17 of the promissory notes were lost petitioner executed 17 replacement promissory notes, that petitioner signed the Estoppel Certificate on March 29, 1990, and that petitioner agreed to the judgment in favor of HCT, which judgment was for the full $ 2,655,000 total principal amount of all 18 promissory notes. We agree with respondent's determination that petitioner did not have an actual and honest profit objective for his investment in the MVT's and that petitioner's promissory notes *89 lacked economic substance and did not constitute genuine indebtedness. The promissory notes were not executed as a result of arm's-length negotiations between petitioner, Hudson, and Montage. The promissory notes did not reflect the fair market value of the MVT's, and they were based on a grossly inflated purchase price for the MVT's. The promissory notes were not executed for independent, nontax-motivated reasons. Respondent's expert witness appraised 8 of the 18 MVT's that he considered to be a representative sample of the MVT's. He viewed the 8 MVT's, and he analyzed their visual and audio quality. He concluded that the audio quality was poor and ineffective and that the editing was incomplete. After researching the performers, respondent's expert witness concluded that most of the performers on the MVT's had limited appeal outside of Texas. He concluded that because of the poor quality of the MVT's and the limited geographic appeal of most of the musicians, the MVT's would not be saleable to commercial television stations, cable television companies, or to syndicated television stations. He also concluded that in 1981 the home video market was not a feasible market given *90 the unavailability of reasonably priced videotape players. After analyzing the potential stream of income to be earned from the MVT's, respondent's expert witness concluded that in 1981 all 18 of petitioner's MVT's had a total "commercial value" of $ 35,000 (approximately $ 1,986 per MVT), but that the MVT's had a fair market value of zero under the typical "willing buyer, willing seller" standard used to determine fair market value. We generally agree with and adopt all aspects of respondent's expert's analysis of the MVT's at issue in this case. The quality of the MVT's was poor. No credible revenue projections support a value for each MVT anywhere near the $ 160,000 stated purchase price, and petitioner's failure to obtain and Hudson's failure to provide credible revenue projections to petitioner at the time petitioner purchased the MVT's is particularly significant. Moreover, petitioner did not obtain any appraisals of the MVT's. No credible distribution or marketing effort was undertaken by the distribution companies or by petitioner with respect to the MVT's. The MVT's were not in final edit format. They were not suitable for broadcast on radio or television. In spite *91 of the poor quality of the MVT's, petitioner, in December of 1982, refused to accept the $ 212,500 refund offered to him by Hudson representing most of the cash downpayments petitioner had made. Instead, petitioner continued to claim very substantial tax benefits associated with the grossly overvalued MVT's. The evidence in this case establishes that the $ 147,500 promissory notes executed by petitioner in favor of Montage in exchange for the MVT's were not the result of arm's-length negotiations and that they were in substance sham notes lacking in any economic significance beyond the desired tax benefits. The $ 147,500 promissory notes will not be recognized as valid, genuine indebtedness for Federal income tax purposes. We conclude that petitioner lacked the requisite profit objective when he purchased the MVT's. Petitioner's execution of replacement promissory notes, the sale of the promissory notes to HCT, and the $ 2,655,000 judgment in favor of HCT all occurred well after June 1, 1983, the date respondent's audit of petitioners' joint Federal income tax returns began. Given the weight of evidence that indicates the sham nature of the promissory notes, we give little weight *92 to these post-audit transactions. See Thomas v. Commissioner, 84 T.C. 1244, 1277, 1281 (1985), affd 792 F.2d 1256 (4th Cir. 1986). We also note that Hudson's connection with Hicks through his wife's prior joint ownership with Hicks of H & M also supports our conclusion not to credit the above post-audit transactions. Although some of the musicians on the MVT's had successful careers, this fact does not change the weight of the evidence in this case that indicates that the investments in question were tax driven shelter investments, not investments based on actual and honest profit objectives. Petitioners argue that petitioner relied on the tax opinion letter and advice he received from the Texas law firm hired by Montage in making his investment in the MVT's. That letter, however, contains mere boilerplate language and provides no factual basis for establishing the validity of the investment in question. We conclude that section 183 governs the tax attributes of petitioner's investment in the MVT's. Investment tax credits and deductions relating to petitioner's investment in the MVT's are allowable only to the extent *93 that petitioner received income from the investment. Because no income was earned, petitioners are entitled to no investment tax credits nor any deductions with regard to the investment in the MVT's. Our conclusion that petitioner lacked the requisite profit objective renders it unnecessary to decide whether petitioner's MVT's were placed in service in 1981 for purposes of the investment tax credits and depreciation and loss deductions claimed with respect thereto. Also, it is unnecessary to consider the parties' arguments concerning whether the MVT's qualify for the investment tax credit, and the proper basis for computing the investment tax credit. Additions to Tax and Increased Interest
As we have held, significant evidence in this case establishes the absence of an actual and honest profit objective and the nongenuineness of the large promissory notes relating to petitioner's investment in the MVT's. We believe, however, that under the unique facts of this case and carefully considering the demeanor of petitioner at trial, the imposition of the addition to tax for negligence under section 6653(a) would be inappropriate. In our discretion, we hold for petitioners as *94 to the additions to tax for negligence. For 1978 through 1986, respondent determined that with regard to the portion of petitioners' underpayments that are attributable to tax-motivated transactions, petitioners are liable for increased interest under section 6621(c), and that for 1978 through 1985, petitioners are liable for additions to tax for valuation overstatements under section 6659. Among the types of transactions that are considered to be tax-motivated transactions are valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Under section 6659(c), a valuation overstatement exists if the value of the property or the adjusted basis of property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6621(c)(3)(A)(i). Also, congress delegated to the Secretary the authority to "specify other types of transactions which will be treated as tax motivated for purposes of [section 6621(c)]". Sec. 6621(c)(3)(B). Among the additional types of transactions that are considered under respondent's regulations to be tax-motivated transactions are those involving deductions *95 that are disallowed under section 183 because of a lack of profit objective. Sec. 301.6621-2T, Q&A-4, Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984); see also Jackson v. Commissioner, T.C. Memo. 1990-520. With regard to each of the years involved, we have concluded that petitioner did not invest in the MVT's with an actual and honest profit objective and that their reporting of this investment constituted a valuation overstatement. Accordingly, petitioners, for those years, are liable for increased interest under section 6621(c) and for the section 6659 additions to tax. For 1986, respondent determined that petitioners are liable under section 6661 for an addition to tax for substantial understatement of tax equal to 25 percent of the underpayment of tax attributable to the claimed net operating loss carryover that resulted from petitioner's investment in the MVT's. In order for an understatement of tax to be considered substantial, the amount of the understatement must exceed the greater of 10 percent of the taxes required to be shown on the Federal income tax return or $ 5,000. Sec. 6661(b)(1)(A). *96 For purposes of section 6661, the amount of the understatement is reduced to the extent that the understatement is attributable to items with respect to which the taxpayers' tax treatment of the items is or was supported by substantial authority. Sec. 6661(b)(2)(B). We have rejected the claimed net operating loss carryover for 1986, and we find that petitioners had no substantial authority for claiming such carryover. We therefore sustain the section 6661 addition to tax for 1986. Decision will be entered under Rule 155. Footnotes
1. Eighteen times $ 12,500 equals $ 225,000.↩
2. Eighteen times $ 147,500 equals $ 2,655,000.↩